IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| Priest Petroleum Corporation and Roy O. Priest <br> v. <br><br> Drawbridge Special Opportunities Fund LP, Drawbridge Special Opportunities GP LLC, D.B. Zwirn Special Opportunities Fund, L.P., and D.B. Zwirn Partners, LLC | § § § § § § § § § § § § § § § § CIVIL ACTION NO. 3:07-cv-00170 |

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

TO THE HONORABLE UNITED STATE DISTRICT JUDGE:

COME NOW, Plaintiffs, Priest Petroleum Corporation ("PPC"), and Roy O. Priest ("Priest"), and for their First Amended Complaint for Damages and Declaratory Judgment against Defendants Drawbridge Special Opportunities Fund LP and Drawbridge Special Opportunities GP LLC (collectively "Drawbridge") and D.B. Zwirn Special Opportunities Fund, L.P. and D.B. Zwirn Partners, LLC. (collectively "DBZ"), would show as follows:

**I.
STATEMENT OF CASE**

1.1     This is an action to recover damages for breach of contract, tortious interference with existing contract, tortious interference with prospective relationships and breach of fiduciary duty.

## II.
## JURISDICTION AND VENUE

2.1     This Court has jurisdiction over the subject matter and parties in this case as the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between each Plaintiff and each Defendant. These causes of action are brought pursuant to 28 U.S.C. § 2201, *et seq.,* and 28 U.S.C. § 1332.

2.2     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391, since a substantial part of the property at issue is located in this district.

## III.
## PARTIES

3.1     PPC is a Texas corporation with its principal place of business located at 440 Louisiana Street, Suite 430, Houston, TX 77002.

3.2     Plaintiff Roy O. Priest is an individual residing in Houston, Texas.

3.3     Defendant Drawbridge Special Opportunities Fund LP, is a foreign corporation doing business in the State of Texas for the purpose of accumulating monetary profit, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Texas. For these reasons, service of process is to be made pursuant to Tex.Civ.Prac. & Rem Code § 17.044 by serving the Secretary of State of Texas as agent for Drawbridge Special Opportunities Fund LP. This suit arises out of business contacts in this State and, under the circumstances, Drawbridge Special Opportunities Fund LP has appointed the Secretary of State of Texas as its agent upon whom service of process may be had in this action. The Secretary of State is requested to forward a copy of this Complaint, along with Summons, to this Defendant by forwarding same by certified mail, return receipt requested, to

Defendant, Drawbridge Special Opportunities Fund LP, at its home office, 1251 Avenue of the Americas, Suite 1600, New York, NY 10020.

3.4     Defendant Drawbridge Special Opportunities GP LLC, is a foreign corporation doing business in the State of Texas for the purpose of accumulating monetary profit, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Texas. For these reasons, service of process is to be made pursuant to Tex.Civ.Prac. & Rem Code § 17.044 by serving the Secretary of State of Texas as agent for Drawbridge Special Opportunities GP LLC. This suit arises out of business contacts in this State and, under the circumstances, Drawbridge Special Opportunities GP LLC has appointed the Secretary of State of Texas as its agent upon whom service of process may be had in this action. The Secretary of State is requested to forward a copy of this Complaint, along with Summons, to this Defendant by forwarding same by certified mail, return receipt requested, to Defendant, Drawbridge Special Opportunities GP LLC, at its home office, 1251 Avenue of the Americas, Suite 1600, New York, NY 10020.

At all relevant times, said Defendant was/is the general partner of Defendant Drawbridge Special Opportunities Fund LP.

3.5     Defendant D.B. Zwirn Special Opportunities Fund, L.P., is a foreign corporation doing business in the State of Texas for the purpose of accumulating monetary profit, but does not maintain a regular place of business or a designated agent upon whom service of  process may be had for causes of action arising out of such business done in the State of Texas. For these reasons, service of process is to be made pursuant to Tex.Civ.Prac. & Rem Code § 17.044 by serving the Secretary of State of Texas as agent for D.B. Zwirn  Special Opportunities Fund, L.P. This suit arises out of business contacts in this State and, under the circumstances, D.B. Zwirn Special

Opportunities Fund, L.P. has appointed the Secretary of State of Texas as its agent upon whom service of process may be had in this action. The Secretary of State is requested to forward a copy of this Complaint, along with Summons, to this Defendant by forwarding same by certified mail, return receipt requested, to Defendant, D.B. Zwirn Special Opportunities Fund, L.P., at its home office, at 745 Fifth Avenue, New York, NY 10151.

3.6     Defendant D.B. Zwirn Partners, LLC, is a foreign corporation doing business in the State of Texas for the purpose of accumulating monetary profit, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Texas. For these reasons, service of process is to be made pursuant to Tex.Civ.Prac. & Rem Code § 17.044 by serving the Secretary of State of Texas as agent for D.B. Zwirn Partners, LLC. This suit arises out of business contacts in this State and, under the circumstances, D.B. Zwirn Partners, LLC has appointed the Secretary of State of Texas as its agent upon whom service of process may be had in this action. The Secretary of State is requested to forward a copy of this Complaint, along with Summons, to this Defendant by forwarding same by certified mail, return receipt requested, to Defendant, D.B. Zwirn Partners, LLC, at its home office, 745 Fifth Avenue, New York, NY 10151.

At all relevant times, said Defendant was/is the general partner of D.B. Zwirn Special Opportunities Fund, L.P.

## IV.
## FACTUAL BACKGROUND

4.1     In late-2004, Plaintiffs began the search for capital to fund a deal to purchase certain oil and gas properties from Penn Virginia Oil & Gas Corporation ("Penn Virginia"), including the West Ganado Field, Jackson County, Texas (the "Properties").

4.2     On or about December 22, 2004, Petrobridge Investment Management, LLC ("Petrobridge") made an Illustrative Proposal to Plaintiffs, outlining the terms of a $40,000,000 Acquisition and Development Credit Facility, which Petrobridge, as arranger and Plaintiffs' agent, proposed to make available to Plaintiffs through financial institutions affiliated with Petrobridge.

4.3     Upon information and belief, Petrobridge acts as an agent for lenders, its principals, and, among other things, locates properties for its principals to lend against, and otherwise acts on behalf of those principals, according to actual and ostensible authority. Upon information and belief, Petrobridge communicates all relevant matters regarding loan funding and credit facility usage to Defendants, who direct Petrobridge's actions.

4.4     Plaintiffs accepted the Petrobridge proposal on or about December 23, 2004.

4.5     On or about December 22, 2004, Plaintiffs entered into a Purchase and Sale Agreement with Penn Virginia for the purchase of certain properties, including the West Ganado Field, Jackson County, Texas. In due course, PPC became the operator of record for the Properties, and continues to operate those Properties.

4.6     On or about January 24, 2005, PPC, as General Partner for PPC Energy, L.P., entered into a Credit Agreement with Defendants Drawbridge and DBZ, as arranged by Petrobridge.

4.7     In addition and in order to obtain the financing, Plaintiffs were required under the Credit Agreement to enter into a commodity price hedging arrangement, which they did, at an average cost of $126,500 per month until the sale of certain West Texas properties which sale closed and the underlying indebtedness was paid on December 15, 2006. Thereafter, and since a portion of the hedge is still in place, PPC Energy, L.P., continues to be burdened with a hedge on a portion of its production through December 31, 2007.

4.8     Furthermore, until December 15, 2006, Drawbridge, as "Administrative Agent" under the Credit Agreement, had exclusive control over a "Lockbox Account" into which all funds, not limited to revenue from the sale of production, generated from the properties, and out of which all funds necessary to pay operating and other expenses flowed. This exclusive control gave Defendants extraordinary and crushing power over Plaintiffs' operations, which Defendants exercised to obtain unlawful and incomprehensible interest rate concessions from Plaintiffs, and to manipulate and restrict the cash flow required by Plaintiffs to comply with the Credit Agreement and maintain the Properties, all to force a breach of the Credit Agreement to create an additional, unwarranted, benefit to Defendants.

4.9     From January 24, 2005, through November, 2005, Plaintiffs made capital requests on Defendants under the Credit Agreement, which were readily granted.

4.10    Around November, 2005, Plaintiffs advised Petrobridge of its interest in selling certain of the Properties, and began expanding its activities to include both ordinary course operation and sale of the Properties.

4.11    Soon after Plaintiffs advised Petrobridge of its desire to sell the properties, Plaintiffs' ready acceptance to capital requests began to diminish. Increasingly, it became more and more difficult for Plaintiffs to obtain funds from Defendants to pay for capital projects necessary to maintain adequate production levels on the Properties. Accordingly, as expected the daily production volumes began to decline.

4.12    In December 2005, Plaintiffs attempted a negotiated sale of certain Properties to a third-party based on a firm offer. Petrobridge, as agent for Defendants, strongly discouraged the negotiated sale approach, and instead pushed strongly for a demonstrated market bid transaction. Defendants insistence on a market bid transaction and their unwillingness to accept the negotiated

offer caused the negotiated sale to be lost, and delayed the sale process for many months, and caused Plaintiffs to incur greater and greater hedge settlement costs than had the property been sold as Plaintiffs had previously negotiated.

4.13    To create momentum for the sale of the certain Properties, Plaintiffs selected one of several proposed marketers put forward by Petrobridge. However, this marketer was ineffective and accomplished nothing, except considerable expense to PPC. After incurring considerable expense to terminate the marketer's agreement, Plaintiffs retained a divestiture broker to package certain of the Properties for sale.

4.14    In December 2005, Petrobridge stopped funding capital expenditures necessary to develop values in the Properties, citing as justification the sales process which it had prolonged, even though Plaintiffs had sufficient funds remaining under the Credit Agreement to implement its proposed capital projects. The unfunded capital projects were part of the original project inventory and business plan identified to the Defendants and incorporated as an exhibit to the Credit Agreement at the time of acquisition. When Defendants refused to honor the obligations of their credit agreement, the daily production, as expected, began to decline which accordingly impacted the sale package negatively by causing lower production volumes for the property, and thus a lower sale price.

4.15    During the first quarter of 2006, Petrobridge began to admonish Plaintiffs for not meeting production and cash flow targets, even though Plaintiffs advised Petrobridge, repeatedly, that its decision to stop funding capital expenditures, previously identified in the Credit Agreement, caused Plaintiffs not to meet its production and cash flow targets, which in turn caused Plaintiffs not to be able to meets its accounts payable obligations in a timely manner. Additional capital projects were proposed by Plaintiffs which would have increased the cash flow, but were never acted upon

by the Defendants. Without Defendants and Petrobridge making funds available there was no way to correct this production shortfall.

4.16   With Plaintiffs' capital funding shut off, they were forced to pay extraordinary divestiture costs out of Plaintiffs' pre-determined general and administrative (G&A) expense allowance, which was not intended for paying such costs. On several occasions, this forced payment of extraordinary divestiture costs from G&A and caused Plaintiffs to extend its payables.

4.17   The cessation of capital expenditures required to maintain or increase its production levels since December 2005, caused production to decline dramatically during a time when oil prices continued to rise, causing the hedge settlements to increase, more interest to be paid to Defendants, and oil & gas service company demands for higher costs which increased lease operating costs, thus leaving insufficient funds to timely pay vendor invoices.

4.18   In April 2006, Defendants granted specific funding for capital projects, only because of contractual obligations which would result in a severe penalty if work was not completed by March 31, 2006. At this time, Defendants changed funding methodology to only fund after the work had been performed and when invoices were due. This process was to occur weekly, instead of the monthly method as originally instructed by Defendants' agent, Petrobridge. However, this process did not occur and Petrobridge did not wish to fund until the amount of invoices due reached $100,000. This caused further aging of payables, which required additional management and accounting time and caused damage to Plaintiffs' reputation in the oil and gas industry.

4.19   In June 2006, Plaintiffs entered into an agreement with a divestiture broker to represent Plaintiffs in the sale of certain of the Properties. The broker in turn retained an agent who represented Plaintiffs by providing engineering and marketing services to potential buyers of the certain Properties.

4.20	On several occasions, in particular on or about August 7, 2006, Rob Lindermanis ("Lindermanis") one of the principals of Petrobridge, met personally with the agent, and intimated Plaintiff PPC would be "fired" and removed as operator of the Properties if no purchase offer was agreed to by August 31, 2006.  Not only was it grossly inappropriate for Lindermanis to tell the divestiture agent that the owner would be fired , but it also demonstrates how Defendants, through Petrobridge, intentionally undermined the sales process to create in Defendants additional, unwarranted benefit.

4.21	In addition, Lindermanis improperly divulged to others the amount of debt held by Plaintiffs on the Properties, highly confidential and proprietary information which should not have been disclosed to any person, and in particular a potential purchaser of the Properties, all in breach of the Credit Agreement.  Lindermanis continued to have periodic meetings and telephone conversations with the divestiture agent, without requesting permission from Plaintiffs to do so.

4.22	Defendants, through their agent Petrobridge, locked Plaintiffs into a "death spiral," in which Defendants alone controlled the release of capital based on Plaintiffs successfully meeting various production targets.  But, without sufficient capital being released by Defendants, Plaintiffs were forced to expend funds from their G&A, leaving them with insufficient funds to pay both vendor service invoices for ongoing operations, pay salaries, and also to fund capital projects in order to meet production targets.

4.23	Defendants, through their agent Petrobridge, attempted to force Plaintiffs into default under the Credit Agreement, and to cause the removal of Plaintiff PPC as operator, by:

 i.) delaying the sale of certain of the Properties, thereby increasing Plaintiffs' hedge settlement, interest owed to Defendants, and other costs;

ii.)   failing or refusing to release capital based on a potential future sale which Defendants delayed; and,

iii.)  asserting Plaintiffs' failure to meet production goals while simultaneously refusing to release capital to fund capital projects related to those production goals.

4.24   As of December 15, 2006, the Defendants' loans were paid in full.

# V.
# CAUSES OF ACTION

A.   <u>Vicarious Liability of Defendants for Breach by Vice-Principal</u>

5.1   Petrobridge committed several torts as agent for Defendants, causing damage to Plaintiffs.

5.2   Defendants operate as corporate entities.

5.3   Petrobridge was engaged in the performance of non-delegable or absolute duties of Defendants, or had delegated to it by Defendants the management of all or part of Defendants' businesses, as relates to its dealings with Plaintiffs and as to the Properties.

5.4   Petrobridge's acts and omissions were directly related to Defendants' businesses, as relates to its dealings with Plaintiffs and as to the Properties, and consequently Defendants must be held liable for torts committed by its Vice-Principal Petrobridge.

B.   <u>Breach of Contract</u>

5.5   Plaintiffs and Defendants had a valid, enforceable contract in the form of the Credit Agreement, and additional documents executed and given effect in accordance with the Credit Agreement.

5.6   Plaintiffs have standing to sue Defendants under the Credit Agreement.

5.7	Plaintiffs have performed, tendered performance, or were excused from performing under the Credit Agreement at all relevant times.

5.8	Defendants, through their Vice-Principal Petrobridge, breached the Credit Agreement by divulging or distributing confidential information as defined in the Credit Agreement or otherwise.

5.9	Defendants breach of the Credit Agreement has caused damages of approximately $10,000,000.

C.	Tortious Interference with Existing Contract

5.10	Plaintiffs had a valid contract with third-parties for the sale of certain of the Properties.

5.11	Defendants, through their Vice-Principal Petrobridge, willfully and intentionally interfered with the contract by divulging or distributing confidential information to Plaintiffs' sales agent, who had previously made an offer to purchase certain of the Properties.

5.12	Defendants interference with Plaintiffs' contract was a proximate cause of Plaintiffs' injury.

5.13	Plaintiffs incurred actual damage or loss as a result of Defendants interference, of approximately $10,000,000.

D.	Tortious Interference with Prospective Relationships

5.14	There is a reasonable probability that Plaintiffs would have entered into prospective business relationships with third persons for the sale of certain of the Properties, or purchase of other properties.

5.15	Defendants, including through their Vice-Principal Petrobridge, intentionally interfered with these prospective business relationships.

5.16    This interference was the proximate cause of Plaintiffs' injury as respects the sale of certain of the Properties.

5.17    Plaintiffs suffered actual damage as a result of this interference of approximately $8,000,000, for additional interest payments, other fees and costs, a drop in production on the Properties, and a significant increase in hedge liability due to this interference from not completing this sale.

E.    Breach of Fiduciary Duty

5.18    Plaintiffs and Defendants had at all relevant times a fiduciary relationship.

5.19    Defendants breached their fiduciary relationship with Plaintiffs.

5.20    Defendants breach of their fiduciary relationship with Plaintiffs resulted in both injury to Plaintiffs, and benefit to Defendants.

5.21    Defendants breach has caused Plaintiffs actual damages, economic damages, including both out-of-pocket losses for greater hedge settlement expenses and lost profits on the sale of certain of the Properties, foreseeable mental anguish damages, and exemplary damages for Defendants intentional breach intended to create in Defendants additional, unwarranted benefit.

F.    Declaratory Relief

5.22    An actual controversy has arisen between Plaintiffs and Defendants concerning the interpretation of the Credit Agreement, and the rights and responsibilities of the parties to that agreement.

5.23    Because of the existing controversies, it is necessary and appropriate at this time for the Court to construe the terms and conditions of the Credit Agreement, and to determine and declare the respective rights, obligations and liabilities which exist among the parties to this action under

the Credit Agreement. Further, Plaintiffs request the Court to award attorneys' fees as are just pursuant to all applicable state and federal laws.

      5.24    Plaintiffs must receive judgment as a matter of law from this Court regarding its rights and obligations under the Credit Agreement, and Plaintiffs now seek such a declaration from this Court, in accordance with Federal Rules of Civil Procedure, Rule 57, and 28 U.S.C. § 2201, that Defendants have breached the Credit Agreement to the damage of Plaintiffs.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the relief pled above, attorneys' fees, costs of court, exemplary damages, and for such other and further relief, in law and in equity, to which they may show themselves justly entitled.

                                              Respectfully submitted,

                                              /s/ *Francis I. Spagnoletti*
                                              _____
                                              Francis I. Spagnoletti
                                              SBN 18869600 / Federal ID. 5369
                                              401 Louisiana, 8th Floor
                                              Houston, Texas 77002
                                              Telephone:    713-653-5600
                                              Facsimile:     713-653-5656

<u>**OF COUNSEL**</u>

SPAGNOLETTI & CO.
David S. Toy
SBN 24048029 / Federal ID. 588699